# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, K.M. MCDONALD, M.K. JAMISON**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**ALEJANDRO TORRES**
**LANCE CORPORAL (E-3), U.S. MARINE CORPS**

**NMCCA 201300396**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged**: 28 June 2013.
**Military Judge**: LtCol Christopher J. Thielemann, USMC.
**Convening Authority**: Commanding General, 1st Marine Logistics Group, Camp Pendleton, CA.
**Staff Judge Advocate's Recommendation**: LtCol E.J. Peterson, USMC.
**For Appellant**: LT Carrie E. Theis, JAGC, USN.
**For Appellee**: Maj Paul M. Ervasti, USMC.

28 August 2014

---
## OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

JAMISON, Judge:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of sexual assault and adultery in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934. The military judge sentenced the appellant to reduction to pay grade E-1, confinement for a period of two years, and a dishonorable

Judge Jamison participated in the decision of this case prior to detaching from the court.

discharge. The convening authority (CA) approved the sentence as adjudged.

The appellant raises seven assignments of error (AOE). In his first AOE, the appellant argues that the military judge erred when he relied on his own knowledge of "the ways of the world" and "human experience" to conclude that the victim, AM, was incapable of consenting to the sexual act. In his second AOE, the appellant argues that the military judge committed legal error by not articulating the standard he used in his special findings to conclude that AM was incapable of consenting to the appellant's sexual act. In his third AOE, the appellant argues that Article 120(b)(3), UCMJ, as-applied to his conduct, violated his right to equal protection under the law. In his fourth AOE, the appellant argues that the statutory element requiring a victim to be "incapable of consenting . . . due to impairment by . . . [an] intoxicant," is unconstitutionally vague as-applied to the facts of his case. In his fifth AOE, the appellant argues that the evidence is legally and factually insufficient to sustain his sexual assault and adultery convictions. In his sixth AOE, the appellant argues that the military judge erred in calculating the maximum punishment for sexual assault. In his seventh AOE, the appellant argues that unlawful command influence infected his court-martial requiring the dismissal of charges.

After consideration of the pleadings of the parties and the record of trial, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

**Factual and Procedural Background**

The victim in this case, AM, married a high school friend, Lance Corporal (LCpl) CM, in May of 2012. Following their wedding, AM remained in her home town while LCpl CM returned to his duty station in Twentynine Palms, California. In July 2012, AM came to the Southern California area to spend time with her husband. With LCpl CM soon to deploy and having had no honeymoon following their wedding, the two visited Disneyland in Anaheim, California on 1 July 2012. The next day, they traveled to Twentynine Palms, California, and spent the night in a local motel. That evening at the motel, they argued; AM was upset that LCpl CM had been texting a female Marine. Tempers subsided and they later engaged in sexual intercourse.

2

On 2 July 2012, LCpl CM and AM planned to house-sit for LCpl CM's best friend, LCpl CG, and his wife, GG, while they spent the 4th of July holiday in Arizona. Although LCpl CM had stayed at LCpl CG's house in the past, this was the first time that AM had been there. Having had only three hours sleep the previous night, AM spent the day at the motel pool while LCpl CM was at work. AM had a breakfast burrito in the morning, some crackers or chips during the day, and met her husband later that afternoon.

LCpl CM and the appellant were friends and worked in the same section. LCpl CM was interested in having a deployment going-away party at LCpl CG's house that evening and invited the appellant. Prior to going to the house, AM, LCpl CM, and the appellant ordered burritos from a local restaurant and ate them in the appellant's barracks room. AM only ate half of her burrito.

While at the barracks room, LCpl CM contacted various friends and invited them to his party. LCpl CM and the appellant bought beer and other alcohol at the base package store and all three arrived at LCpl CG's house at approximately 2130. LCpl CM and AM stored their luggage in the spare bedroom that contained an air mattress.

Despite LCpl CM's efforts to invite friends to his party, due to the late notice and the fact that some had previously scheduled plans to be out of the area for the 4th of July holiday period, nobody else showed up at the house. LCpl CM, the appellant, and AM started drinking. Initially, AM had debated whether she should just go to sleep because she was very tired from the night before.

Over the course of playing three rounds of "beer pong," AM drank approximately six beers.[1] Record at 157. Additionally, over the next several hours, she drank two shots of vodka, part of an additional beer, and a couple of mixed drinks. She

---

[1] According to AM, the version of "beer pong" (a popular drinking game) that they played starts by pouring beer into ten cups arranged in the shape of a triangle at both ends of a table. *See* Prosecution Exhibit 16. Approximately two beers are used in filling each player's ten cups for one round of play. The object of the game is for the player to throw a ping pong ball into one of the opponent's cups on the opposite end of the table. If the player is successful and the ping pong ball lands in one of the opponent's cups, the opponent has to drink the contents of that cup. AM testified that she lost every round and as a consequence, she estimated that she drank approximately six beers (two beers per round). Record at 157.

3

consumed this approximate amount of alcohol from about 2200 until about 0115, when she began to feel ill.

AM told her husband she was not feeling well. She staggered down the hallway using the walls for support and went into the bathroom. Both LCpl CM and the appellant saw AM stagger down that hall and into the bathroom. She knelt next to the toilet and started "dry heaving." *Id.* at 162. After a few minutes, AM fell asleep in the bathroom at approximately 0130.

At approximately the same time, LCpl CM, highly intoxicated himself, went outside on the concrete patio to smoke a cigarette. While smoking, he was sitting on a table but soon fell asleep on top of the table.

The next thing AM remembered was waking up in the spare bedroom on the air mattress. She had no memory how she got there and was disoriented and in discomfort; she then realized that someone was having sexual intercourse with her. As she started to wake up, she realized that she was wearing only a bikini top. The tank top, shorts, and underwear that she had worn while asleep in the bathroom had been removed.[2] By the time she regained her senses, AM saw the appellant, naked, lying next to her. She rolled off the air mattress, grabbed some clothes that were on top of her red suitcase, and went to look for her husband.

AM found her husband passed out on the patio table. She yelled at him and began to shake the table in an effort to wake him up, causing the table to fall over and LCpl CM's face to smash against the concrete patio. Within seconds, LCpl CM started bleeding.

Upset, disoriented, and scared, AM called 911 between 0240 and 0245. When speaking with the 911 operator, AM was emotional and was having difficulty orienting herself in the house. Having never before been in the house, AM did not know the address, but eventually was able to find some mail with the house address. While her primary concern was her husband's condition, she told the dispatcher that she had been raped by

---

[2] AM's shorts and underwear were on top of a pile of her husband's clothes located on top of his opened black suitcase. *See* PE 8 and 9.

the appellant and that the appellant was still in the house. Prosecution Exhibit 1.[3]

At approximately 0255, local police arrived. One officer took pictures while another interviewed AM. According to the officer who interviewed her, AM smelled of alcohol, was crying, and slurred some of her words. In his opinion, he believed that AM was still under the effects of alcohol.

The police arrested the appellant. AM underwent a sexual assault forensic examination at the local hospital. As part of the examination, AM provided a urine sample and a blood sample. The urine sample collected at approximately 0710 showed a urine alcohol concentration (UAC) of .08% weight over volume.[4] The blood sample taken at 0730 showed AM's blood alcohol content (BAC) to be 0.00%.

At trial, the trial defense counsel sought to impeach the credibility of AM and attack the Government's theory that AM was incapable of consenting due to the effects of alcohol. Citing her BAC value of .00% at 0730, trial defense counsel argued that AM's testimony of how much alcohol she drank lacked credibility. Trial defense counsel argued that rather than being incapable of consent, AM was instead lying to cover for her consensual sexual conduct with the appellant. After considering all the evidence and arguments by both counsel, the military judge rejected the defense theory and convicted the appellant of both charges. Record at 373.

Following the announcement of sentence, both parties requested special findings from the military judge pursuant to RULE FOR COURTS-MARTIAL 918(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). *Id.* at 441-42. The military judge attached special findings for the sexual assault conviction prior to authenticating the record. AE XXXII.

---

[3] During the 911 call, AM stated that she did not think that the appellant meant to rape her and that she did not want to get the appellant in trouble. PE 1; *see* AE XVIII (transcript of the 911 call) at 5.

[4] Because of unreliability associated with extrapolating a level of intoxication from AM's UAC, the forensic toxicologist rejected speculation regarding AM's alcohol content in her urine other than offering the opinion that AM had consumed alcohol.

**Sufficiency of the Evidence ad Special Findings**

Three of the appellant's assignments of error (I, II, and V) concern themselves with the sufficiency of the evidence and the military judge's analysis of the evidence in his special findings. Because the appellant's first and second AOEs address the military judge's special findings, Appellate Exhibit XXXII, we consolidate these AOEs with AOE V, which attacks the sufficiency of the evidence as to both offenses. We first consider the legal and factual sufficiency of the sexual assault conviction before moving to the adultery conviction.

We review questions of legal and factual sufficiency *de novo*. *United States v. Winckelmann*, 70 M.J. 403, 406 (C.A.A.F. 2011). The test for legal sufficiency is whether any rational trier of fact could have found that the evidence met the essential elements of the charged offense, viewing the evidence in a light most favorable to the Government. *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987). The test for factual sufficiency is whether we are convinced of the appellant's guilt beyond a reasonable doubt, allowing for the fact that we did not personally observe the witnesses. *Id*. at 325.

The term "reasonable doubt" does not mean that the evidence must be free of any conflict. *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007) (citation omitted). When weighing the credibility of a witness, this court, like a fact-finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake, including lapses in memory, or a deliberate lie. *United States. v. Goode*, 54 M.J. 836, 844 (N.M.Crim.Ct.App 2001). Additionally, the members may "believe one part of a witness's testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979).

To convict the appellant of sexual assault at trial, the Government was required to prove the following: (a) that the appellant committed a sexual act upon AM; and (b) that AM was incapable of consenting to the sexual act due to impairment by alcohol and that condition was known or reasonably should have been known by the appellant. MCM, Part IV, ¶ 45(b)(3) & (b)(3)(A).

The appellant does not contest that he committed a sexual act upon AM. His theory at trial and on appeal centers on whether AM was "incapable of consenting." The appellant argues that AM was not a credible witness and that the scientific

evidence contradicted AM's claim of having ingested as much alcohol as she claimed in her testimony. Appellant's Brief of 18 Feb 2014 at 24. We disagree.

The appellant primarily relies on the forensic toxicologist's opinion that "at most, [AM's] BAC was [at] .09" grams of alcohol per 100 milliliters of blood. *Id.* This level, the appellant argues, is insufficient to conclude beyond a reasonable doubt that AM was incapable of consenting to sexual intercourse. We find the appellant's argument unpersuasive.

First, we note that the same forensic toxicologist was unable to definitively state what AM's BAC was at the time she fell asleep in the bathroom, or at the time of the sexual assault. Although the forensic toxicologist testified regarding the average hourly rate of alcohol elimination from the bloodstream, she was unable to extrapolate to a reasonable degree of scientific certainty because the BAC level of 0.00% did not have a starting point. Record at 310.

Given the scientific caveats of the forensic toxicologist's opinion, the value the appellant places on AM's BAC -- as the primary means of attacking the sufficiency of the evidence -- diminishes. The forensic toxicologist also testified that drinking on an empty stomach may lead to quicker alcohol absorption, and that drinking while tired may produce additive effects with regard to alcohol impairment. *Id.* at 300, 321.

In addition to AM's testimony, LCpl CM testified that he saw AM stagger into the bathroom using the wall for balance. Additionally, he testified that AM had passed out on prior occasions from drinking too much alcohol. LCpl CM testified that on each occasion he had to carry her to bed, and each time she remained unconscious while he carried her.

Following the sexual assault, AM called 911 and accused the appellant of rape. When the deputies arrived, AM smelled of alcohol, her eyes were bloodshot, and she slurred some of her speech. Additionally, the military judge specifically found that AM's testimony was "credible [and] very believable." AE XXXII at 6.

Conducting our own factual sufficiency analysis, we are unpersuaded by the appellant's characterization of the scientific evidence and his credibility attacks on AM and LCpl CM. Additionally, the military judge specifically commented on AM's credibility and believability. Conducting our own analysis

and considering the record before us -- mindful "that the trial court saw and heard the witnesses," Article 66(c), UCMJ -- we are convinced beyond a reasonable doubt of the appellant's guilt of sexual assault upon AM.

Similarly, we reject the appellant's argument that LCpl CM's testimony was insufficient to establish the terminal element of adultery. In addition to being a percipient witness, LCpl CM testified about the effect that the appellant's acts had on good order and discipline. He testified that he struggled at work for several months following the incident and that he found it difficult to trust other Marines because of what the appellant did to AM. Additionally, because of the incident, LCpl CM was unable to deploy, and the appellant received a military protective order and was transferred to a different work section.

The appellant argues that proof of the terminal element was insufficient because LCpl CM's testimony regarding whether the appellant's conduct was prejudicial to good order and discipline centered on the sexual assault charge, not the adultery charge. We disagree. One aspect for the fact-finder to assess on the question of whether adulterous conduct is prejudicial to good order and discipline is whether "the adulterous act was accompanied by other violations of the UCMJ." MCM, Part IV, ¶ 62c(2)(f). In this regard, LCpl CM's testimony was sufficient to establish the terminal element and we are convinced beyond a reasonable doubt of the appellant's guilt of adultery.

Finally, with respect to both offenses, we conclude that a rational trier of fact could have found that the evidence met the essential elements of the charged offenses, viewing the evidence in a light most favorable to the Government.

**Special Findings**

Because the appellant's first and second AOE address the military judge's special findings, AE XXXII, we consolidate these AOEs for purposes of our analysis. In his first AOE, the appellant argues that the military judge committed plain error in his special findings when he discounted the scientific evidence with regard to AM's level of intoxication in favor of his "knowledge of 'human nature and the ways of the world.'" Appellant's Brief at 11 (quoting AE XXXII). In his second AOE, the appellant argues that the military judge committed plain error by his failing to "articulate[] what standard he actually used to determine guilt." *Id*. at 14 (citing AE XXXII).

The appellant's arguments are somewhat novel. Due to the fact that the military judge submitted his special findings on the date he authenticated the record, the appellant did not have a realistic opportunity to object at trial. Thus, we agree with his assertion that the correct scope of review is plain error.[5]

*A. Reliance on Common Sense and Ways of the World*

The appellant argues that the military judge committed plain error when he analyzed the evidence and concluded that AM was incapable of consenting due to impairment by alcohol. Appellant's Brief at 10-12. The appellant does not take issue with the general proposition that a trier of fact may rely on "[o]rdinary human experience and matters of common knowledge." Appellant's Brief at 10. Instead, he argues that the military judge used his "human experience" to discount the scientific evidence of AM's BAC. We disagree.

In conducting our plain error analysis, we begin with the legal premise that a military judge who "sits as the trier of fact" is presumed to "know[] the law and appl[y] it correctly." *United States v. Phillips*, 70 M.J. 161, 166 (C.A.A.F. 2011) (citing *United States v. Robbins*, 52 M.J. 455, 457 (C.A.A.F. 2000)). Accordingly, the appellant faces a high burden to even establish error because "plain error before a military judge sitting alone is rare indeed." *United States v. Raya*, 45 M.J. 251, 253 (C.A.A.F 1996).

In this case, we conclude that the military did not err and applied the correct standard in concluding beyond a reasonable doubt that AM was "incapable of consenting due to impairment by alcohol." AE XXXII. Contrary to the appellant's argument, the military judge did not inappropriately reject, ignore, or discount the scientific evidence. Rather, he found that based on the scientific testimony of the forensic toxicologist, "[n]o credible evidence was presented to pinpoint when [AM's] BAC reached 0.00%." AE XXXII at 6. Based on this finding, which is clearly supported by the record, the military judge concluded that he was unable "to determine [AM's] expected BAC on or about the time she passed out or during the sexual act." *Id.*

To reconcile the testimonial and scientific evidence, the military judge stated that he relied on "[his] common sense and

---

[5] Within the context of our plain error review, we will grant relief "only where (1) there was error, (2) the error was plain and obvious, and (3) that error materially prejudiced a substantial right of the [appellant]." *United States v. Sweeney*, 70 M.J. 296, 304 (C.A.A.F. 2011).

[his] knowledge of human nature and the ways of the world." *Id*. This was not error. First, the discussion portion to R.C.M. 918(c) instructs a finder of fact to "us[e] common sense and knowledge of human nature, and . . . weigh the credibility of witnesses." Second, "ways of the world" assessment in evaluating evidentiary credibility has long been recognized within military law. *See United States v. Frey*, 73 M.J. 245, 250 (C.A.A.F. 2014) (holding that trial counsel's argument to members during sentencing that they rely on "the ways of the world" to conclude that Frey would molest children in the future without any evidentiary predicate was improper but not prejudicial); *see also United States v. Rivera*, 54 M.J. 489, 492 (C.A.A.F. 2001) (holding that it was reasonable for members to rely on "common knowledge" to conclude that a punch to the stomach of "13-year-old . . . create[ed] a substantial risk of serious bodily injury"). Although *Frey* and *Rivera* were both members cases, we find no reason why the principles that members may use their common sense and ways of the world to assess the credibility of the evidence should not apply in equal measure in a military judge alone case.[6]

Simply stated, the military judge considered all the scientific and testimonial evidence and used his common sense and his knowledge of human nature to conclude that AM was incapable of consenting to the sexual act due to her level of intoxication. The military judge specifically articulated that he considered the scientific evidence. He just did not ascribe as much weight to the scientific evidence as the appellant. Because we find the military judge's reliance on his "common sense" and "knowledge of human nature and the ways of world," AE XXXII at 6, was appropriate in evaluating all the evidence in the record, the appellant cannot meet his burden of establishing plain error.

*B. Articulation of Standard in Assessing AM's Impairment*

Next, the appellant argues that the military judge committed plain error by failing to articulate an appropriate standard for assessing the appellant's guilt. Appellant's Brief

---

[6] The facts in this case are readily distinguishable from *Frey*. In *Frey* the court analyzed the trial counsel's sentencing argument in which he argued that the members use their "common sense [and] ways of the world," to conclude that Frey, as a "child molester[]," would commit future acts of child molestation. *Frey*, 73 M.J. at 247-48. There was no evidence offered or admitted before the court in *Frey* that addressed Frey's recidivistic nature. Thus, it was inappropriate for members to rely on their common sense and "ways of the world" with regard to recidivism because such evidence requires at a minimum expert testimony and evidence.

at 14. We disagree. The military judge used the appropriate legal standard to conclude the AM was incapable of consenting to the sexual act and that the appellant knew or reasonably should have known of her condition.

The appellant asserts that the military judge stated on the record that he did not know the appropriate definition of "incapable of consenting due to impairment of alcohol." *Id.* at 12-14. Having carefully reviewed the record, we disagree with the appellant's assertion. Other than noting that the statute does not define "incapable of consenting," the military judge expressed no confusion or lack of knowledge regarding the appropriate standard to be applied to the appellant's case. Record at 442. This discussion came up within the context of a request by both trial counsel and trial defense counsel for the military judge to make special findings. The military judge's rationale for providing special findings was to articulate his evaluation of all the evidence to include credibility determinations of the witnesses as a way to assist "the concerns that people may have with respect to the new [Article] 120." *Id.*

We also disagree with the appellant's argument that the military judge's special findings did not contain an appropriate standard to assess that AM was incapable of consenting to the sexual act. The military judge used the appropriate standard -- the beyond a reasonable doubt standard -- in assessing the scientific, physical, and testimonial evidence in concluding that the appellant was guilty of sexual assault. Accordingly, we reject the appellant's argument that the military judge committed plain error with regard to his special findings.

**Equal Protection Claim**

In his third AOE, the appellant argues that Article 120(b)(3), UCMJ, as-applied to his case violated his constitutional rights to equal protection under the law. The appellant argues that because he was intoxicated and had "higher symptoms of impairment [than AM]," the only reason he was labeled the perpetrator was his gender. Appellant's Brief at 17. He constructs a strawman argument to propound his claim. He argues that if having sexual intercourse with AM was a crime because of the "effect alcohol had on her mental capacity . . . then it was also a crime for [AM] to engage in sexual acts with" the appellant. *Id.* at 18. We disagree.

11

Prior to addressing the appellant's equal protection argument, however, we consider whether the appellant forfeited his claim by his failure to raise it at trial. Under the circumstances of this case, we conclude that he has. *See United States v. Goings*, 72 M.J. 202, 205 (C.A.A.F. 2013) (concluding that Goings's as-applied due process challenge to the constitutionality of indecent acts under Article 134 was forfeited by his failure to raise the issue and develop facts at trial)*; see generally*, *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) (facial equal protection claim not raised below not properly before the court on appeal)*; Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir. 1987) (same). Because of the "presumption against the waiver of [a] constitutional right[]" without a "clearly established . . . relinquishment" of that claimed right, we consider the appellant's AOE forfeited rather than waived. *Goings*, 72 M.J. at 205. Accordingly, we review for plain error.

We interpret the appellant's equal protection argument as essentially a selective-prosecution argument. Assuming *arguedo* that the appellant's claim is even justiciable because the sovereign that elected to prosecute the appellant would have no jurisdiction over AM, this argument is without merit. First, the appellant has failed to meet his required burden of showing discriminatory intent. *United States v. Hagen*, 25 M.J. 78, 84 (C.M.A. 1987). Second, courts are particularly "ill-suited to . . . review" prosecutorial decisions. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Third, we presume that the CA acted in good faith in his decision to refer charges following the recommendation of the Article 32, UCMJ, investigating officer and the Article 34, UCMJ, pretrial advice recommendation from his staff judge advocate. *See United States v. Masucock,* 1 C.M.R. 32, 35 (C.M.A. 1951) (noting that there is a long-standing legal presumption of "regularity in the conduct of governmental affairs")*; see also Hagen*, 25 M.J. at 84 (holding that within context of allegation of vindictive prosecution by a CA, "[t]here is a strong presumption that the convening authority performs his duties as a public official without bias"). We find no discriminatory effect or purpose associated with Article 120(b)(3), UCMJ, generally, or with the decision specifically to prosecute the appellant for sexually assaulting AM. It was, after all, the appellant who initiated sexual intercourse with the unconscious AM. Accordingly, the appellant has not met his burden of establishing error, let alone plain and obvious error.

12

**As-Applied Vagueness Challenge to Article 120(b)(3)**

In AOE IV, the appellant, for the first time on appeal, argues that Article 120(b)(3), UCMJ, is unconstitutionally vague as-applied to the facts of his case. Specifically, the appellant argues that "[i]incapable of consenting to the sexual act due to impairment by alcohol" is unconstitutionally vague because this definition cannot be understood by "the common man or those who prosecute" this offense. Appellant's Brief at 19-20. We disagree.

We review *de novo* the appellant's constitutional challenge to Article 120(b)(3). *See Goings*, 72 M.J. at 205. Additionally, we find that his failure to raise this challenge at trial forfeited any claim absent plain error. *Id*.

To determine whether a statute "clearly applies" and provides fair notice of the proscribed conduct, we consider not only the plain language of the statute, but also other sources, including the "[Manual for Courts-Martial] . . . military case law, military custom and usage, and military regulations." *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003).

In 2012, Congress amended Article 120, UCMJ.[7] In the 2012 version of Article 120, Congress sought to clarify some of the constitutional infirmities identified in the major congressional overhaul of Article 120 as part of the National Defense Authorization Act for Fiscal Year 2006 (FY06 NDAA). Rather than the pre-2007 definition of rape as "by force and without consent," the FY 2006 NDAA sought to establish various gradations of culpability associated with sexual crimes. This was refined further in the current version of Article 120, UCMJ.

The concept of a victim being incapable of consent due to intoxication has long been proscribed criminal conduct within the military. *See United States v. Grier*, 53 M.J. 30, 33 (C.A.A.F. 2000) (holding no instructional error where military judge instructed the members that if victim is incapable of consenting due to intoxication, "no greater force is required that that necessary to achieve penetration"); *United States v. Mathai*, 34 M.J. 33, 36 (C.M.A. 1992) (holding that evidence of rape was sufficient where the record established that the victim was unconscious due to alcohol intoxication, "and that [Mathai]

---

[7] *See* National Defense Authorization Act for Fiscal Year 2012 (FY12 NDAA). Article 120(b)(3) became effective for offenses committed on or after 28 June 2012. See FY12 NDAA, Pub.L. No. 112-81, 125 Stat. 1298, 1404-07 (2011).

reasonably knew or should have known that she had not consented"); MCM, Part IV, ¶45c(1)(b) (2005 ed.).[8]

The appellant argues that because the phrase "incapable of consenting to the sexual act" is not further defined, the statute is unconstitutionally vague. We disagree. First, this argument ignores the remainder of Article 120(b)(3): that the accused knew or reasonably should have known that the victim was incapable of consenting. We find nothing vague about the statute, and the requirement to prove actual or constructive knowledge on the part of the appellant further serves to negate his claim of vagueness. Second, to the extent the appellant's argument addresses "close cases" with regard to level of intoxication, that argument "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *In re Winship*, 397 U.S. 358, 363 (1970)).

Based the plain text of Article 120(b)(3), UCMJ, and military jurisprudence that has traditionally interpreted virtually identical conduct, we find that service members of ordinary intelligence have "fair notice of what is prohibited." *Id.* at 304. We readily conclude that one who engages in sexual intercourse with another who is unconscious due to alcohol intoxication could be prosecuted if the individual who initiated the sexual act knew, or should have known, that the other person was unconscious. *See Vaughan*, 58 M.J. at 31 (holding that "fair notice" for purposes of evaluating vagueness claims may include the Manual, "military case law, military custom and usage, and military regulations"). Additionally, we find that Article 120(b)(3) is not so "standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. Accordingly, the appellant has not met his burden of establishing error, let alone plain and obvious error.

### Maximum Punishment for Article 120(b)(3) Conviction

In his sixth AOE, the appellant argues that the military judge erred when he calculated thirty years' confinement as the maximum punishment for sexual assault under Article 120(b)(3),

---

[8] "Consent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the female is unable to resist because of lack of mental or physical faculties." MCM, Part IV, ¶45c(1)(b) (2005 ed.).

UCMJ.[9]  At the time of his misconduct, the appellant argues, the President had not defined maximum punishment limitations under Article 120, UCMJ.  Therefore, he contends, the maximum punishment at his trial was limited to the jurisdictional maximum of a summary court-martial.  Appellant's Brief at 26. We disagree.

Assuming that the appellant did not affirmatively waive this issue by specifically conceding on the record that the maximum punishment for the sexual assault was thirty years, Record at 375, we conclude that the military judge correctly concluded that the maximum punishment was thirty years.  *See United States v. Booker*, 72 M.J. 787, 807 (N.M.Ct.Crim.App. 2013), *appeal denied*, 73 M.J. 92 (C.A.A.F. 2013) (summary disposition).[10]

### Unlawful Command Influence

In his seventh AOE, the appellant argues that his trial was infected by unlawful command influence (UCI) based on certain comments made in April 2012 by the Commandant of the Marine Corps during a series of lectures he gave at Marine Corps installations known as the "Heritage Brief."  The appellant argues that we must set aside his sexual assault conviction due to the impact of apparent UCI because the military judge is a Marine Corps officer "under the authority of the [C]ommandant." Appellant's Brief at 29.

We disagree and hold that the appellant has failed to meet his burden of production to demonstrate either actual or apparent UCI, as he has failed to show "proximate causation between the acts [allegedly] constituting [UCI] and the outcome of the court-martial."  *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994)).  The appellant provides no evidence to support his claim short of identifying the military judge as a Marine Corps officer.  We have no reason to believe that the military judge was affected by the appellant's claim of UCI and we will not presume otherwise.[11]  *United States v. Rivers*, 49

---

[9] The military judge *sua sponte* merged the sexual assault conviction and the adultery conviction for sentencing purposes.  Record at 374.

[10] The appellant acknowledges that our recent decision in *Booker* controls; however, he raises this AOE solely to preserve the issue.  Appellant's Brief at 26.

[11]  The appellant raised UCI at trial but focused solely on the potential impact on the panel.  AE II.  After ordering some prophylactic measures, the

15

M.J. 434, 443 (C.A.A.F 1998); *see United States v. Phillips*, 70 M.J. 161, 166 (C.A.A.F 2011) (holding that "[w]hen the military judge sits as the trier of fact, we presume that the military judge knows the law and applied it correctly") (citing *Robbins*, 52 M.J. at 457).

## Conclusion

The findings and the sentence as approved by the CA are affirmed.

Chief Judge MITCHELL and Judge MCDONALD concur.

For the Court

R.H. TROIDL
Clerk of Court

---

military judge deferred ruling on the motion to include the appellant's request for additional peremptory challenges. Record at 57-60. When the appellant elected to be tried by military judge alone, the military judge noted that the "motion for unlawful command influence, and appropriate remedy, which was not the dismissal the defense was requesting, but additional peremptory challenges is no longer before this court since it's been overcome by the forum selection." *Id*. at 99. The appellant took no issue with this ruling. At no time did the appellant raise an issue concerning any prejudicial impact on the military judge that flowed from the Commandant's Heritage Brief comments.